**F. A. Marriage License**

KLEIN, P. J. and LEFEVER, J., May 19, 1955.—Application for a marriage license was filed by the applicants on April 30, 1955. It appears from the statements made by the female applicant (herein referred to as F. A.), that she was a mental patient in St. Mary's Hospital, Philadelphia, for a period of two months in 1951.

Mr. MacDonnell, assistant orphans' court clerk, pursuant to the provisions of section 9[1] of The Marriage Law of August 22, 1953, P. L. 1344, 48 PS §1, et seq., refused to issue the license and certified the matter to this court for hearing.

This is the first time that this court has been asked to construe the provisions of the new marriage law, pertaining to the issuance of a marriage license to a person who has been afflicted with mental illness within a period of five years prior to the date of application for the license.

For years the marriage statutes of this Commonwealth had lacked clarity and had been out of adjustment with advances in medical science and our chang-

---

1. "Section 9: Orphans' Court to Pass Upon Refusal of Clerk to Issue License.—

"In those cases where the right to a license is not made to appear, the clerk of the orphans' court shall refuse to issue the same. Upon request of the applicants, the clerk of the orphans' court, immediately after such refusal, shall certify the proceedings to the orphans' court of the county without formality or expense to the applicants.

"Such application for a license to marry shall thereupon, at the earliest possible time, be heard by a judge of said court, without a jury, in court or in chambers, during the term or in vacation, as the case may be. The finding of the court that a license ought to issue or ought not to issue shall be. final, and the clerk of the orphans' court shall act in accordance therewith.

"The true intent of this section is to secure for applicants an immediate hearing before the orphans' court without delay or expense on the part of the applicants."

ing approaches to social problems. The old statutes were defective in three principal respects.[2]

1. The legislature had failed to designate with particularity the persons who were authorized to perform marriages. The only express authorization was found in section 1206 of The Third Class City Law of June 23, 1931, P. L. 932, 53 PS §12198-1206 (renumbered §1207, and amended June 28, 1951, P. L. 662, sec. 12.2; August 21, 1953, P. L. 1292, sec. 3.), wherein mayors of cities of the third class were expressly empowered to solemnize marriages. Authority for other persons to perform this important function could only be found by implication.[3]

2. Refugees who had fled from totalitarian terrorism, whose spouses had died in concentration camps, labor camps, gas chambers or otherwise, under circumstances which made efforts to obtain death certificates or other positive proof of death almost hopeless, found it virtually impossible to remarry and reëstablish themselves in normal family relationships. There was no provision in the law for issuance of licenses in such cases.

3. Section 15 of the Act of July 24, 1913, P. L. 1013, provided that:

". . . no license to marry shall be issued where either of the contracting parties is an imbecile, epileptic, of unsound mind, or under guardianship as a person of unsound mind".

The statute did not define the prohibited sicknesses nor give the court any discretion as to the manner in which the statute was to be administered.

---

2. See "Some Suggested Legislative Changes" by Klein, P. J. (O. C., Phila.), Pa. Bar Assn. Quarterly, October 1952, vol. 24, p. 16.

3. See Freedman Law of Marriage and Divorce, vol. 1, p. 80; "Powers of Judges to Perform Marriage Ceremonies", by Mr. Justice Ladner, Pa. Bar Assn. Quarterly, April 1951, vol. 22, p. 278.

The discovery of new drugs has dramatically reduced the ill effects of epilepsy. Enlightened medical opinion now regards the absolute bar to marriage of epileptics as harsh, unjust, and unnecessary. Tremendous strides have also been made in the care of the mentally ill, resulting in cures in many cases and substantial improvements in others. It is now possible for some of these people to marry without serious risk to themselves, their spouses, their offspring, or the community generally.

The Marriage Law of 1953 recognized these advances in medicine, and in a large measure, corrected these long existing, entrenched deficiencies in our marriage laws.

The uncertainty with respect to officials who are permitted to solemnize marriages has been removed. Section 13 of the act designates with particularity the persons in whom such authority is now vested.[4]

The judges of the orphans' courts now have jurisdiction, under certain designated circumstances, to decide that the spouse of an applicant is a presumed decedent. For a discussion of this phase of the new marriage law see the companion opinion (which was drafted contemporaneously with this, although filed two days later), viz., Application for Marriage License of Magdalene Pest and Josef Kolesnik, 4 D. & C. 2d 12.

---

4. "Section 13: Persons Qualified to Solemnize Marriages. The chief justice and each justice of the Supreme Court, the president judge and each judge of the Superior Court, the president judge and each judge of the court of common pleas court, the president judge and each judge of the orphans' court, the president judge and each judge of the Allegheny County and the Philadelphia Municipal Court, each magistrate, alderman, justice of the peace, mayor of any city, and burgess of any borough of this Commonwealth, and each minister, priest or rabbi of any regularly established church or congregation, is hereby authorized to solemnize marriages between such persons as produce a marriage license issued by the clerk of the orphans' court. . . ."

The provisions of the old law, which forbade the issuance of a license to a person who "is an imbecile, . . . of unsound mind, or under guardianship as a person of unsound mind", has been substantially re-enacted in the new act.[5] However, the absolute prohibition against the issuance of a marriage license to an epileptic has been repealed. Under the 1953 statute a marriage license may be issued to a person who is suffering from epilepsy or who has been, within five years preceding the time of the application, an inmate of an institution for epileptics, but only if authorized by a judge of the orphans' court.[5] Likewise, if the applicant has been an inmate of an institution "for weak-minded, insane or persons of unsound mind" within five years preceding the time of the application, the license may be issued only if authorized by a judge of the orphans' court.

The legislature has thus placed a great social responsibility on the orphans' court. It is our duty to determine whether "it is for the best interest of such applicant and the general public to issue the license." Yet, the statute contains no criteria, standards or rules for determining this fact; and no definition of crucial terms used in the statute. This is perhaps necessary, for the broad discretion vested in the courts, will en-

---

5. "Section 5. Restrictions on the Issue of Marriage License.— No license to marry shall be issued by any clerk of the orphans' court: . . .

"(d) If either of the applicants for a license is weak-minded, insane, of unsound mind, or is under guardianship as a person of unsound mind.

"(e) If either of the applicants is an epileptic, or is or has been, within five years preceding the time of application, an inmate of an institution for epileptics, weakminded, insane, or persons of unsound mind, unless a judge of the orphans' court shall decide that it is for the best interest of such applicant and the general public to issue the license, and shall authorize the clerk of the orphans' court to issue the license."

able them, in true common-law tradition, to progress with the advances of science in this difficult and inexact field of law and medicine and decide each case on its own facts.

A vast, hazy shadowland exists between mental health and mental illness. The gradations of abnormalities are as varied and diffused as the merging colors of the rainbow. The most illustrious and respected psychiatrists often disagree radically in their opinions with respect to the sanity of an individual.

The following extract from the Encyclopaedia Britannica, vol. 12, p. 383 (14th ed.) points up the difficulty very sharply:

"INSANITY. This term ordinarily connotes more or less severe unsoundness of mind. Though its loose usage is almost synonymous with mental disease, scientifically the term should only be applied to the mental condition of an individual who, through socially inefficient conduct, has to be placed under supervision and control. The mind is the mechanism by means of which we adapt adequately to our environment and when, through its derangement, conduct is exhibited which the community looks upon as evidence of disease and as implying irresponsibility, the individual concerned is said to be insane and the law steps in to certify him as such. Strictly speaking, then, insanity is really a social and legal term and not medical. Mental illness is a broad concept which may include very efficient members of society. No satisfactory definition can therefore be arrived at, since it would be necessary to define what we mean by sanity, which would involve us in equal difficulties."

The phrase "an inmate of an institution for weakminded, insane, or persons of unsound mind" is, likewise, subject to interpretation. Institutions for the insane are no longer regarded merely as places in

which persons of unsound mind are confined as custodial cases to rid the general public of their troublesome presence. Today, great progress is being made toward curing the mentally sick and the establishments in which they are housed are usually called "hospitals". In fact, many general hospitals have departments set aside for the care of the mentally sick. Furthermore, in present day usage the word "inmate" has been generally replaced by the more charitable word "patient". The language of the statute is general, but we believe that the legislature intended to include all cases in which the applicant has been hospitalized for treatment of some form of mental illness or deficiency in any mental institution, including a general hospital which conducts a department for the care of the mentally sick.

Basically, the problem which confronts us is one for the medical profession. A diagnosis by judicial decree should not be made except with the advice, and upon the recommendation of, trained psychiatrists.

The statute does not in so many words state that an applicant who has been in a mental institution must be cured permanently at the time the application is made. However, because the issuance of a license to a person who is weak-minded, insane or of unsound mind is absolutely prohibited by the statute, the legislature must have intended that a license is to be issued only to a person who has been completely cured of his mental illness or whose condition has so improved that he can be expected to lead a normal life and to take his place in society without serious risk to himself or to the community generally.

Leading members of the medical profession freely admit that the science of caring for the mentally ill is in its infancy. Much research and investigation has been undertaken recently which has resulted in tre-

mendously enhancing the chances of curing or, at least, improving the condition of persons suffering from mental sickness.

It seems clear that under no circumstances should a marriage license be issued to persons having a mental deficiency of severe degree, e.g., an idiot or imbecile. It is also apparent that persons suffering irremedial brain injury, or deteriorating organic brain syndromes which are of progressive or irreversible nature, e.g., senile dementia, should not be permitted to marry.

On the other hand, many persons who are unable to cope with the intense pressures of the modern age, suffer what is commonly designated as "mental breakdowns" and are institutionalized. Most of these people respond favorably to therapy; many are completely cured. These obviously are the persons whom the legislature intended to benefit primarily and furnish no serious problem when they apply for marriage licenses.

The real difficulties arise with respect to persons who suffer moderate mental deficiency or who have been hospitalized because of the more serious mental illnesses, such as manic-depressive psychosis, schizophrenia (dementia praecox), post-partum psychosis, and involutional melancholia. Although many of these cases are completely hopeless, a great number show marked improvement under modern therapy, such as shock treatment, psychotherapy, and the use of newly discovered drugs. Some of these persons are able to leave the mental hospitals and, at least temporarily, take their places in society as useful citizens. Some apparently have complete remission from their malady. Whether they have recovered sufficiently to assume the responsibilities of marriage presents an extremely delicate question.

No general rule can be handed down. Each case is sui generis and must be decided upon its own facts.

The discretion vested in the orphans' court must be carefully exercised in order to protect not only the applicants and their issue, but the general public as well.

Three preliminary requirements seem to be indicated in every case before a license should issue: (1) Full disclosure must be made to both applicants of all of the details of the case history of the applicant who has been mentally afflicted; (2) the court must be satisfied that such applicant has recovered sufficiently to adjust normally to the problems of everyday living, particularly those arising from the marriage relationship, and (3) the court must be reasonably assured that if children are born of the marriage, such children will be normal, healthy children, free from the taint of mental illness or deficiency.

With these principles in mind, let us examine the factual situation existing in the present case.

No question is raised concerning the sanity of the male applicant. He was present at the hearing, fully cognizant of the history of F. A.'s mental sickness, and is, nevertheless, not only willing, but eager, to marry her.

F. A. is 30 years of age. She was graduated from a Catholic parochial grade school and attended Little Flower High School for two years. She left school when she was about 17 years old and took a job in a hosiery mill, "sewing on piece-work". She continued in the hosiery industry until, apparently, the pressure of "piece-work" caused her to have a mental breakdown. She was hospitalized at St. Mary's Hospital in Philadelphia for a period of eight weeks with a diagnosis of dementia praecox. While in the hospital she received a full course of electric shock treatments, following which she received treatments as an out-patient

until December 1953, when she was pronounced well. It appears, further, from the testimony that since her discharge from the hospital she has managed the household of her invalid sister satisfactorily and efficiently and has given no evidence of any recurrence of her malady.

Dr. William L. Long, the physician who treated F. A., was the principal witness in her behalf. Dr. Long has specialized in neuropsychiatry since 1928 and is well and favorably known to the court. He is chief neuropsychiatrist at St. Mary's Hospital, and is on the psychiatric staff at Nazareth Hospital, Doctor's Hospital, and the Philadelphia General Hospital. Dr. Long examined F. A. shortly before the date of the hearing. He testified:

"I am satisfied that she is fully recovered from her illness and I think she now has a well-adjusted emotional life."

He testified further that, in his opinion, if she had children they would be normal. He recommended that the marriage license be issued.

Following the hearing, at the request of the hearing judges, F. A. was examined by Dr. Nicholas G. Frignito, neuropsychiatrist for the Municipal Court of Philadelphia. Dr. Frignito filed a written report in which he made a diagnosis of dementia praecox (recovered normal intelligence). This report concluded with the opinion that F. A. is now recovered from her mental illness and is competent to marry.

After a careful study of the record in this case we make the following findings of fact:

1. That St. Mary's Hospital, Philadelphia, is an institution for persons who are insane or of unsound mind, within the purview of The Marriage Law of 1953;

2. That F. A. was an inmate of the mental department of that institution from April 16, 1951, to June 16, 1951;

3. That F. A. was an out-patient of the mental department of that institution from June 1951 until December 1953, when she was discharged as cured;

4. That F. A. is not at this time weak-minded, insane, or a person of unsound mind;

5. That the male applicant is fully aware of the entire history of F. A.'s mental illness, and

6. That there is no compelling evidence that children, if any, born of this marriage will be mentally deficient or predisposed to mental illness.

This is a borderline case and we confess that we are beset with doubts. However, life at its very best is uncertain. Probably in a strictly disciplined society persons of defective mentality would be deprived of the blessings of matrimony. This, however, is an imperfect world. It is difficult to foretell the unhappy consequences which might result from our refusing to issue a marriage license in this case in view of the fact that the marriage banns have been posted, and all of the arrangements for the marriage have been made. The applicants are obviously in love with each other. If they cannot be married in this State, they may be tempted to live together without the benefit of marriage, or to seek a marriage license in another State where the restrictions are less stringent. Under all of the existing circumstances, we are of the opinion that it is for the best interest of the applicants and the general public to issue the marriage license.

Accordingly, we enter the following

*Decree*

And now, May 19, 1955, the clerk of the court is directed forthwith to issue a marriage license to the applicants.